Ina May SIMPSON and Donal C. Brayton, Executors and Personal Representatives of the Estate of Erle Simpson, Deceased; Donal C. Brayton, a/k/a Donald C. Brayton, and William J. Kirven, Trustees of the Trust created under the Last Will and Testament of Erle Simpson, which has been duly admitted to probate; Erle J. Simpson; Scott Douglas Forbes Simpson: Dan Burnett; John Visconti; Musetta Martin, and Ina May Simpson, Appellants (Defendants),

v.

KISTLER INVESTMENT COMPANY, and Cornelia F. Vaillancourt, Appellees (Plaintiffs).

No. 85–129.

Supreme Court of Wyoming.

Jan. 22, 1986.

Bruce P. Badley and Clay B. Jenkins of Badley & Rasmussen, P.C., Sheridan, for appellants.

Rebecca W. Thomson and Henry A. Burgess of Burgess & Davis, Sheridan, for appellees.

Before THOMAS, C.J., and ROONEY,* BROWN, CARDINE and URBIGKIT, JJ.

URBIGKIT, Justice.

This case is an appeal from a declaratory judgment imposing a constructive trust on interests in severed mineral estates derived from a ranching business relationship of ancestors to the present litigants. Two separate ranches were involved.

The trial court's decision in granting the relief requested by imposition of a constructive trust will be affirmed.

The three groups of participants as claimants to the severed mineral interests are the Simpson family (Simpson), successors to Erle Simpson, as defendants and now appellants with the Kistler Investment Company, as successor to W.L. Kistler, Jr., deceased (Kistler), and Cornelia F. Vaillancourt (Vaillancourt), as plaintiffs and now appellees.

Simpson defines the appellate issue as to the Flying MY Ranch mineral-interest controversy:

"The District Court erred, as a matter of law, in ordering a conveyance of minerals to the appellees (a deceased partner's heirs and successors) in violation of the Wyoming Uniform Partnership Act," (partnership liquidation real-property question),

and as to the Three Bar Ranch:

"The District Court erred in holding that the 1959 assignment from Erle Simpson, an individual, to Three Bar Ranch, Inc., a corporation created vested mineral interests [by stated reservation or exception] in W.L. Kistler, Jr. and Robert and Cornelia Vaillancourt, contrary to *Burnell v. Roush*, Wyo., 404 P.2d 836 (1965)." (Reservation or exception-in-favor-of-third-party rule.)

Kistler and Vaillancourt differently stated the issues: (1) that it was the intent of the parties to own the underlying minerals in their proportionate share; (2) that a new partnership was created between the heirs of Kistler and the surviving partner, Erle Simpson, after the death of W.L. Kistler, Jr.; (3) since the mineral estate remained in the name of Simpson, that a trust should be imposed to denominate the beneficial ownership interests of the participants in proportion to their contribution for acquisition and partnership operation.

We would find three questions presented:

(1) Status of the mineral estates in the Three Bar Ranch transaction as affected by the rule that a conveyance cannot be accomplished by a reservation or exception in favor of a stranger to title.

(2) Status of partnership real property after dissolution and termination of the partnership.

(3) Imposition of a constructive trust on the interests in the severed mineral estates to establish title rights without assignment documents executed as conveyances.

There is no significant factual dispute. The basic facts and extensive exhibits were introduced by stipulation. At issue is a severed mineral interest remaining after the sale of ranchlands in northern Wyoming and southern Montana.

The parties in the present conflict include the heirs, distributees and devisees of Erle J. Simpson, as appellants, with the distributee and devisee of W.L. Kistler, Jr., and Cornelia Vaillancourt (now widowed, and the only original remaining participant) as appellees.

Simpson was a Wyoming rancher, Kistler an oil and gas real estate and ranching entrepreneur from Oklahoma, and Cornelia and Robert Vaillancourt were friends of the Kistler family and residents of California. Cornelia was a sister of Simpson's first wife, Edith.

These interrelations and associations led to the mutual arrangement for their acquisition of the Three Bar Ranch in 1955. After the ranch commenced operation as a partnership, the parties then organized a corporation for its continued operation, and

* Retired November 30, 1985.

Simpson assigned the ranchlands, as first acquired in his individual name, to the corporation, with the following included in the filed document:

"Excepting and reserving, however, all mineral rights mentioned in said agreement, in that it has been heretofore understood and agreed that the mineral rights pertaining to the Three Bar Ranch shall be distributed and vested as follows, to-wit: 37½% to W.L. Kistler, Jr., 37½% to Erle Simpson and Edith F. Simpson, and 25% to Cornelia F. Vaillancourt."

Simpson claims retention of all originally acquired mineral interests.

The original partnership interests as then continued in the shares issued in the corporation, were Simpson 225 shares or 37.5 percent; Kistler 225 shares or 37.5 percent; Cornelia Vaillancourt and Robert Vaillancourt 150 shares or 25 percent. From 1956 through 1970, W.L. Kistler, Jr. (and his heirs after his death in 1964), Simpson and Vaillancourt continued to make capital contribution in their respective percentages toward the operation of the Three Bar Ranch. Those contributions, which were substantial, are reflected in the books and income tax return for the ranch operation and corporate records.

In 1957, the Flying MY Ranch also became available for purchase, and Simpson, through an intermediary, arranged for its purchase again as acquired in his individual name. The Vaillancourts declined to participate in this additional acquisition, and the ranch was purchased and then operated as a fifty-fifty partnership of Simpson and Kistler, with each contributing one-half of the purchase and operating capital requirements, which amounts were again substantial. Kistler died in 1964, which left Simpson surviving as the remaining partner in the Flying MY Ranch. The interest of Kistler in that partnership and stock in the Three Bar Ranch devolved by devise and distribution to the present Kistler plaintiffs-appellees.

Simpson claims retention of all acquired mineral interest in this ranch also.

In 1970, the Three Bar Ranch (as the corporate owner for Three Bar) and Simpson (as the managing partner for Flying MY) executed a sales agreement to sell both ranches, and provided by agreement:

" * * * and RESERVING to the Sellers, their heirs, executors, administrators, successors and assigns an undivided three-fourths (¾) of all of the oil, gas, fissionable material, coal and other minerals now owned by the Sellers in or under said premises. It is understood and agreed that certain minerals in and under the lands owned by Three Bar Ranch, Inc. are owned or controlled by the shareholder of Three Bar Ranch, Inc., rather than by the corporation, and Three Bar Ranch, Inc. agrees that it will obtain for the Buyers from said shareholders a Mineral Deed conveying one-fourth of all oil, gas, fissionable material and other minerals now owned by said parties under the lands of the Three Bar Ranch, Inc."

A mineral quit-claim deed from Robert M. Vaillancourt, Cornelia F. Vaillancourt and representatives of the Kistler interests, as well as Erle Simpson, was consequently executed, delivered and recorded in accord with the sales agreement. The conveyance by Simpson for the Flying MY Ranch included a reservation of three-fourths of the mineral interest.

The Three Bar Ranch corporation was liquidated in 1971 by assignment of all of its right, title and interest to the shareholders in accord with the proportion of shareholding ownership, and the assets of the Flying MY partnership were divided one-half to each partner. By 1975, distribution and liquidation of the ranch business entities were then generally completed without any consideration of the reserved mineral interests which had been acquired with the original purchase. In 1980, Simpson died.

In the period between 1955 and 1980, various oil and gas leases had been executed as generally signed by Simpson, Kistler or his heirs, and Vaillancourt.

The present conflict first surfaced in 1981, when the Simpson heirs made claim to the total acquired mineral interests in their negotiations for an exploration lease. This suit followed by Kistler and Vaillancourt to contest that claim and assert a proportionate interest in the original interests as acquired with ranch purchases.

No direct mineral conveyance had been executed by Simpson to transfer the mineral rights in the Three Bar Ranch to the individual shareholders or to transfer the interest in mineral rights in the Flying MY to his partner, Kistler.

Restated, Simpson does not now brief or attack the factual basis or sufficiency of evidence for the imposition of the constructive trust, but challenges the inclusion or transfer of any mineral interests as subject to the trust.

## I

### Stranger to the Title Reservation Or Exception Rule

Simpson first premises their appeal on the trial court's failure to apply the long-established rule as discussed in *Burnell v. Roush*, Wyo., 404 P.2d 836 (1965). The rule is variously stated, but is most succinctly defined in two authorities with more comprehensive discussions:

"No interest or estate in land may be created in favor of the stranger to the title by means of a reservation or exception in the conveyance thereof." Harris, *Reservations in Favor of Strangers to the Title*, 6 Okla.L.Rev. 127, 131 (1953). " * * * [I]n a deed neither a reservation nor an exception in favor of a stranger to the instrument can, by force of ordinary words of exception or reservation, create in the stranger any title, right or interest in or respecting the land conveyed." Annot., 88 A.L.R.2d 1199, 1201–1202.

The rule, or aspects thereof, was first considered by the Wyoming Supreme Court in *Burnell v. Roush*, supra, by a quotation of the rule itself from the Oklahoma Law Review article, and the court then said:

"Whether that general rule in its literal and undiluted form is the law of this state under § 8–17, W.S.1957,[1] is a question that has not heretofore been answered. That it is not susceptible of a ready answer is demonstrated by a most cursory examination * * *." 404 P.2d at 838.

Of importance in understanding the decision of this court, it was said:

" * * * The parties have proceeded upon the basis that the rule is and was in effect. That was the theory upon which the case was presented to the trial court, and because we are dealing with property rights we think it important that we adhere to the general rule that the parties are bound here by the theory adopted below." 404 P.2d at 839.[2]

The Wyoming Supreme Court observed the criticism of the rule as a " 'primitive rule of the common law' " (quoting from 1 Williams and Meyers, Oil and Gas Law, §§ 310–314, p. 566), and then noted that only one jurisdiction had expressly repudiated it. If true then, it is not true today.

The direct question addressed in Burnell was not the existence of the rule, but whether, when the rule was conceded, the deed proviso was an exception and that a wife was then a stranger to title in application.

" * * * The conclusion is inescapable that the exception here did not recognize or confirm any title in plaintiff to an undivided one-fourth in the mineral fee." 404 P.2d at 840.

Burnell was followed by *Krug v. Reissig*, Wyo., 488 P.2d 150, 52 A.L.R.3d 748 (1971), with the same jurist writing the opinion.

---

**1.** Section 8–17, W.S.1957, now § 8–1–101, W.S. 1977, was the statute adopting the common law.

**2.** It is of interest that the use of Burnell as succeeding authority in this jurisdiction or otherwise has been essentially limited to the law-of-the-case principle, and not considered as general authority for a definitive adaptation or exclusion of the stranger-to-title principle. *Laramie Printing Trustees v. Krueger*, Wyo., 437 P.2d 856, 859 (1968); *Weber v. Johnston Fuel Liners, Inc.*, Wyo., 519 P.2d 972 (1974); *Pine Creek Canal No. 1 v. Stadler*, Wyo., 685 P.2d 13 (1984).

Krug was unanimous, although Justice Harnsberger had dissented in *Burnell.* The court distinguished the factual situation on the basis that the challenged issue in Burnell was a fee estate in the mineral interest while Krug involved a life estate. This court then validated the life estate in distinction from the fee interest as invalidated in Burnell, by recalling a discussion by Justice Blume in *In re Smith's Estate,* 55 Wyo. 181, 97 P.2d 677 (1940):

> "'* * * The common law is not exactly the common law of 1607. Many, and probably most of the rules of the common law of 1607, aside from equitable rules and aside from fundamental maxims, have been modified by judicial decisions. And that is true with the rule under discussion. And that is true with the other rule under dicussion. Our statute (Sec. 26–101 [R.S.1931]) [now § 8–17, W.S.1957] does not state what are the judicial decisions to which reference is made. However, it is, and has been, the constant practice of courts in common law jurisdictions to freely cite cases from other common-law courts, and we take it that the legislature had in mind the judicial decisions of all of the various jurisdictions. The cases may differ; one court may take one view, another another. Hence we cannot consider these various decisions as the law in this state, but as interpretations of the common law, *and we are at liberty to adopt that interpretation which seems to be the best.'* (Emphasis supplied.)" 488 P.2d at 152.

Krug confirmed the principle that the instrument will be construed without regard to technical rules as an effective reservation of the life estate in the nonowner surviving husband.

One might conclude from these two cases that the state of Wyoming law at the present time is that if the reservation or exception[3] in favor of the third-party wife is a fee interest in the minerals it is void, but if it is only a life estate then it is valid.[4]

These two cases are representative of the confusion, complexity and contradiction as embodied in the state of the law by application of the rule today. See Annot., 52 A.L.R.3d 753, 773, § 8. England, from where the rule came by feudal-law derivation, repealed the rule by statute in 1925.

Independent of any general evaluation of a continued efficacy of the principle in Wyoming that a reservation or exception shall not serve to vest title in a stranger to the title is a dispositive exception applicable in this case.

That exception as universally approved and implemented is nonapplication if the questioned phraseology is considered to recognize, confirm or authenticate an existing right, title or interest. *Independent School District No. 8 of Comanche County v. Hunter,* Okla., 414 P.2d 231 (1966); *Tallarico v. Brett,* Vt., 400 A.2d 959 (1979); *First Nat. Bank of St. Johnsbury v. Laperle,* 117 Vt. 144, 86 A.2d 635, 30 A.L.R.2d 958 (1952); *Toussaint v. Stone,* 116 Vt. 425, 77 A.2d 824 (1951); 6 Thompson on Real Property, § 30.91, p. 787.

The principle is succinctly stated in *Toussaint v. Stone,* supra, 77 A.2d at 826:

> "* * * An effective exception may be made in favor of a third person not a party to the deed in recognition and confirmation of a right already existing in him."

> "An exception of an interest or right already existing in the stranger operates according to its terms as an exception from the grant * * *." 23 Am.Jur.2d, Deeds § 87, p. 133.

---

**3.** The normal rules for differentiating an exception from a reservation are frequently stated and often ignored. An exception excepts, and a reservation regrants. We will not differentiate by characterization, and will discuss both jointly as a single topic.

**4.** The question at issue is usually whether the questioned language vests in the third party. We will not engage in the inconclusive and ephemeral questions by differentiation between stranger to title compared to stranger in interest. *Ives v. Van Auken,* N.Y., 34 Barb. 566 (1857); *Saunders v. Saunders,* 373 Ill. 302, 26 N.E.2d 126, 129 A.L.R. 306 (1940).

Also see discussion and rule, Annot., 88 A.L.R.2d 1199, 1221, Reservation or exception in deed in favor of a stranger. When the interest or right in question is outstanding in the stranger at the time of the conveyance, the language of exception operates to recognize and confirm it. Property rights, if in existence, may be recognized, confirmed and preserved by exception, and when such a purpose plainly appears, clauses phrased as reservations have been construed as exceptions to prevent them from failing and to effectuate the plain purpose of the parties. *Beckley National Exchange Bank v. Lilly*, 116 W.Va. 608, 182 S.E. 767, 102 A.L.R. 462 (1935). See *Butler v. Gosling*, 130 Cal. 422, 62 P. 596 (1900); *Deaver v. Aaron*, 159 Ga. 597, 126 S.E. 382, 39 A.L.R. 126 (1925), overruled on another question by *Harrell v. Harrell*, 250 Ga. 797, 300 S.E.2d 806 (1983); 8 R.C.L. Deeds, § 150, p. 1093. See also *Gwinn v. Gwinn*, 77 W.Va. 281, 87 S.E. 371 (1915).

The validity of the principle embodied in this rule exception is self evident and is reflected in the logical difference between confirmation and conveyance. In this case, the exception and reservation phraseology specifically fits within the exception to recognize, confirm and authenticate *in accord with the principle of the constructive trust.*

We determine, however, that the unsettled status of Wyoming law is not properly served by only assuming a rule and then noting the exclusion by an exception.

Appellant cites with approval *Stetson v. Nelson*, N.D., 118 N.W.2d 685 (1962), in support of the Burnell rule. The Stetson case has been subjected to review and reevaluation by the North Dakota Supreme Court in *Malloy v. Boettcher*, N.D., 334 N.W.2d 8 (1983), wherein for at least some purposes the rule has now been abrogated in North Dakota. Comment, *Deeds—Nature and Creation of Reservations—Reservation of a Property Interest in a Deed in Favor the Grantor's Spouse Is Effective When That Is the Grantor's Intent*, 60 N.D.L.Rev. 317 (1984).

Specifically to try to define where the rule has been generally abrogated, as distinguished from amendment, exception or alteration, will serve little purpose, but at least it can be said without any equivocation that the rule in no form today applies in California, *Willard v. First Church of Christ, Scientist, Pacifica*, 7 Cal.3d 473, 102 Cal.Rptr. 739, 498 P.2d 987 (1972); *District of Columbia, Katkish v. Pearce*, D.C. App., 490 A.2d 626 (1985); Kentucky, *Blair v. City of Pikeville*, Ky., 384 S.W.2d 65 (1964), and *Townsend v. Cable*, Ky., 378 S.W.2d 806 (1964); possibly Michigan, *Mott v. Stanlake*, 63 Mich.App. 440, 234 N.W.2d 667 (1975); Missouri, *Holland v. Holland*, Mo., 509 S.W.2d 91 (1974); North Dakota, *Malloy v. Boettcher*, supra; Oregon, *Garza v. Grayson*, 255 Or. 413, 467 P.2d 960 (1970); and Tennessee, *Dalton v. Eller*, 153 Tenn. 418, 284 S.W. 68 (1926).

■ Joining the enlightened approach that the intent should control and that archaic and inappropriate feudalistic principles should no longer apply, this court determines that the rule is repealed. Persuasive critique and reasoned justification in the cases and texts lead us to abandon this relic of feudal law in the direction of the modern rule of the societal recognition of the intent evidenced by the document. We will now complete what was obviously started for Wyoming law by *Krug v. Reissig*, supra.

The original and principal authority is *Townsend v. Cable*, supra. The court quoted from its earlier case of *Combs v. Hounshell*, Ky., 347 S.W.2d 550, 555 (1961), with the following verbiage:

" 'So in conclusion we must concede that the distinction between a "conveyance" to a third party and a "reservation" in his favor is tenuous and artificial and has long outlived the reason for its existence in the first place. * * * In a future case involving what is intended to be a conveyance over of some interest such as an easement, or even a life estate, but is inartfully couched in terms of reservation or exception in favor of the third party, it may be proper that we consider

abolition of the distinction, * * *.' " 378 S.W.2d at 807–808.

And then, in following its prior inquiry, the court enunciated its decision:

"We have no hesitancy in abandoning this archaic and technical rule. It is entirely inconsistent with the basic principle followed in the construction of deeds, which is to determine the intention of the grantor as gathered from the four corners of the instrument. [Citations omitted.] Technicalities should be disregarded where the intention is clear." 378 S.W.2d at 808.

The evolutionary process in other jurisdictions as less direct than undertaken by the Kentucky court, is best illustrated by a Michigan case, *Mott v. Stanlake,* supra, wherein at issue was a provision in the deed of conveyance to the lot purchaser of " 'reserving the East 100 feet of said lot which is reserved and dedicated to the use of the lot owners of the subdivision.' " 234 N.W.2d at 668. Purchaser, having brought suit to quiet title and obtained judgment on the pleadings in the trial forum, found his success reversed by the appellate court of Michigan in the following fashion. The court noted:

"Defendants claim that the rule is outmoded, unjust, and has outlived any usefulness." 234 N.W.2d at 668,

and then stated:

"The Michigan cases recite the rule relied on but none give effect so as to invalidate the language of the deed. The rationale appears to be circuitous. It goes something like this: A reservation for the benefit of third parties is invalid; to decide whether a clause constitutes a reservation, the courts look to the intent of the parties; since the parties did not intend a nullity, they must have intended an exception. Therefore, the argument concludes, a reservation for the benefit of third parties is invalid, but that which is destined to be invalid should not be intended, thus everything is an exception." 234 N.W.2d at 669.

Consequently, the Michigan Court of Appeals validated the conveyance provision with the notation:

" * * * The viability of the rule has already been so diminished by exception that it may be dead already." 234 N.W.2d at 668.

The Oregon Supreme Court, in *Garza v. Grayson,* supra, 467 P.2d at 961–962, determined:

"The rule adopted in most jurisdictions is that in a deed creating an estate in one person, the grantor cannot reserve an easement or other interest in a third person. There is language in our own cases supporting this view. This rule is derived from a narrow and highly technical interpretation of the meaning of the terms 'reservation' and 'exception' when employed in a deed. It is said that a person other than the grantor 'has no interest in the land to be excepted from the grant, and likewise none from which a reservation can be carved out.'

"We do not regard this as a satisfactory reason for defeating the grantor's intention to create an easement in a person other than the grantee of the estate conveyed in the deed, if the intention to create the easement is adequately expressed in the deed. The view we take is supported by most if not all the legal commentators and by the better reasoned cases. It is also adopted by the Restatement. 5 Restatement of the Law of Property, § 472, p. 2966 (1944) states the rule as follows:

" 'By a single instrument of conveyance, there may be created an estate in land in one person and an easement in another.'

"The contrary view expressed in our previous cases * * * is repudiated."

In *Willard v. First Church of Christ, Scientist, Pacifica,* supra, 498 P.2d at 989, that court comprehensively reviewed the retention of the old common-law rule, and said:

"The rule derives from the common law notions of reservations from a grant and was based on feudal considerations. A

reservation allows a grantor's whole interest in the property to pass to the grantee, but revests a newly created interest in the grantor. (4 Tiffany, The Law of Real Property (3d ed. (1939) § 972.) While a reservation could theoretically vest an interest in a third party, the early common law courts vigorously rejected this possibility, apparently because they mistrusted and wished to limit conveyance by deed as a substitute for livery by seisin. (See Harris Reservations in Favor of Strangers to the Title (1953) 6 Okla.L.Rev. 127, 132–133). Insofar as this mistrust was the foundation of the rule [limitation of conveyance by deed as a substitute for livery by seisin], it is clearly an inapposite feudal shackle today. Consequently, several commentators have attacked the rule as groundless and have called for its abolition. (See, e.g., Harris, supra, 6 Okla.L.Rev. at p. 154; Meyers & Williams, Oil and Gas Conveyancing; Grants and Reservations by Owners of Fractional Mineral Interests (1957) 43 Va.L.Rev. 639, 650–651; Comment, Real Property: Easements: Creation by Reservation or Exception (1948) 36 Cal.L.Rev. 470, 476; Annot., Reservation or Exception in Deed in Favor of Stranger, 88 A.L.R.2d 1199, 1202; cf. 4 Tiffany, supra, § 974, at p. 54; 2 American Law of Property (Casner ed. 1952) § 8.29, at p. 254.)" 498 P.2d at 989.

In further recognition that the California courts had earlier adhered to the common-law rule, it was said:

"* * * In considering our continued adherence to it, we must realize that our courts no longer feel constricted by feudal forms of conveyancing. Rather, our primary objective in construing a conveyance is to try to give effect to the intent of the grantor. * * * In general, therefore, grants are to be interpreted in the same way as other contracts and not according to rigid feudal standards." 498 P.2d at 989.

In accord with many commentators and some cases, the California Supreme Court also then reviewed the utilization of exceptions to authenticate the intent and avoid the frustration of the grantor's purpose.

"* * * Since the rule may frustrate the grantor's intention in some cases even though it is riddled with exceptions, we follow the lead of Kentucky and Oregon and abandon it entirely." 498 P.2d at 991.

Arizona took a similar tack on a parallel question involving alternative grantees, and rejected the ancient rule of invalidity by stating:

"To determine the common law rule on a particular issue, we need not delve into the archives in search of some ancient rule from the English commonlaw, since the commonlaw is not a rigid, dead code, but rather a growing, living body of law. We may therefore look to decisions from sister states in search of commonlaw rules. [Citations omitted.]

"In construing a deed, every attempt should be made to carry out the intent of the grantor, and substance rather than form should control." *Shulansky v. Michaels*, 14 Ariz.App. 402, 484 P.2d 14, 17 (1971).

The North Dakota court in *Malloy v. Boettcher*, supra, added its weight by stating:

"In accordance with the foregoing discussion we follow the jurisdictions of California, Oregon, and Kentucky in abandoning the common-law rule that a reservation or exception unto a third party who is a stranger to the deed or title of the property cannot constitute a conveyance of the property to the third person." 334 N.W.2d at 10.

One of the supporting authorities noted in the North Dakota case was the Wyoming case of *Krug v. Reissig*, supra.

Although it would be realistic to recognize that the majority position includes a retention of the general rule in some context, it would also appear from the case law available and the substantial number of cases involved that the Wyoming case of *Krug* represents the majority view of nonapplication in the one exception where the

reservation or exception is in favor of a spouse.

"A large number of courts faced with this issue have held that the attempted reservation or exception in favor of the grantor's spouse is valid and effectual as such. Although the reasoning of the courts in reaching this result is not always completely clear, it appears that three basic approaches can be used to obtain this result: (1) discarding the general rule where it conflicts with the manifest intention of the grantor; (2) holding that the spouse is not a 'stranger' for purposes of these rules; and (3) holding that the rule is not applicable to reservations or exceptions in favor of the grantor's spouse." Annot., 52 A.L.R.3d 753, 756–757.

The two most comprehensive evaluations of the general rule and the clearest statement of its text are found in 6 Okla.L.Rev., supra at 127, and Annot., 88 A.L.R.2d 1199, supra.

After a comprehensive review of the case law then existent, the author of the Oklahoma law journal article in 1953 concluded:

"Numerically speaking, where the interest involved amounts to an estate in land, the cases which hold the reservation operative far outweigh those which refuse to give it operative effect. This is the quantitative analysis. But what about the comparative logic of the two rules—the qualitative analysis? As was intimated earlier, the considerations which originally gave birth to the common-law rule, particularly those of public policy, are no longer persuasive. The common-law rule was founded on the major premise that it was more desirable from society's standpoint to have uniformity in its deeds of conveyance than it was to give effect to an individual grantor's intention. The 'Rule of Intention,' which is the guiding light for our modern courts in interpreting deeds, is founded on the converse of this major premise. * * *
"That a rule so incongruous with our modern social and legal philosophy has survived in even a modified form is in

itself something of a mystery. Certainly any rule which can only operate to defeat a grantor's intention is undesirable and should be discarded unless some overriding public policy requires its retention. It is difficult to perceive any overriding public policy to support the common-law rule because, as pointed out earlier, the rule condemns only the method of transferring title, rather than the transfer itself. * * * It is submitted that the common-law rule is an oppressive thorn which has ceased to justify its existence." 6 Okla.L.Rev. at 153–154.

The A.L.R. annotation agrees:

"The ultimate question is whether a deed provision in favor of a stranger, where plainly intended to create in him an interest or right in the land, may under the modern law take effect according to its terms and intent, notwithstanding a use of words of reservation or exception. Probably the answer ought to be, and eventually generally will be, in the affirmative. Support for this conclusion is found in some of the cases, and also, it seems in the American Law Institute Restatement, Property § 472, and in certain familiar analogies in the law of trusts and contracts. In England, the result has already been accomplished by statute." 88 A.L.R.2d at 1202.

Comment, *Reservations in Favor of Strangers to the Title: California Abandons the Common Law Rule*, 24 Hastings L.J., 469, 484–485 (1973):

"For more than one hundred years American courts have espoused the commendable theory that the intention of the grantor should be the controlling factor in interpreting deeds and that technicalities should not defeat the obvious intent of the grantor. Despite this purported liberal construction of deeds, many of these same courts have upheld, at least in name, the archaic common law rule that reservations to strangers are ineffective. This obvious inconsistency has at times led to highly undesirable results. Admittedly, the courts have been reluctant to apply the rule. Unfortunately,

however, it has been the practice of many courts to avoid rather than abandon the rule. In an attempt to give effect to the intention of the grantor by circumventing technical rules of construction, the courts have resorted to technicalities as artificial as those they were seeking to avoid, and the resultant unpredictability is precisely what the common law rule sought to eliminate. "Today the common law rule has clearly outlived the reasons for its existence. Its abandonment is a significant step towards creating clarity and uniformity in conveyancing. Unfortunately, to date only three states have abandoned this obviously archaic and impractical rule; indeed its rejection is less than a trend. However, such abandonment is the only true solution to a problem area of the law that has become unnecessarily contrived."

See also:

"Another primitive rule of the common law, still applied in modern law, is this: No interest in land may be created in favor of a stranger to the title by means of a reservation or exception in a conveyance thereof. * * *

"While this rule has mercifully been abandoned or circumvented in many states, a number of contemporary cases have applied it." 1 Williams and Meyers, Oil and Gas Law § 310.4, p. 579.

*Holland v. Holland,* supra, 509 S.W.2d at 95:

" ' * * * "The time has long since passed when the tenure of lands by deed, if it ever existed in this country, was dependent upon the technical meaning of words or construction of sentences in use among old English conveyances. The controlling canon for the construction of deeds, as of wills and other instruments of writing to-day, is to ascertain the meaning of the grantor from the words he uses, in the light of the circumstances which surrounded, attended, and waited upon his use of them." ' " Quoting from *Monroe v. Lyons,* 339 Mo. 515, 98 S.W.2d 544, 546 (1936).

Support is also found in law journal articles, Comment, *Real Property—Common Law Rule Against Reserving an Interest in Property to a Stranger to Title Overruled,* 13 Santa Clara L.J. 344 (1972) (discussion of *Willard v. First Church of Christ, Scientist, Pacifica,* supra); Comment, *Reservation of an Interest in Favor of a Stranger,* 61 Calif.L.Rev. 548 (1973) (discussion of *Willard v. First Church of Christ, Scientist, Pacifica,* supra).

The alternative to the course taken by this court is to retain the rule with exceptions which permeate the validity of the rule as creating a minefield of complex, confusing and hardly rational differentiations (including anti-personnel mines for careless or ignorant scrivners.)[5] The list of

---

5. Without attempting to define their general acceptability or prevalence, these questions of exception and representative cases would include: Reservations or exceptions in favor of a spouse who is a stranger to the title, *Krug v. Reissig,* supra; *Boyer v. Murphy,* 202 Cal. 23, 259 P. 38 (1927); *Saunders v. Saunders,* supra; Annot., 52 A.L.R.3d 753, supra; see *Deaver v. Aaron,* supra, 126 S.E. 382, as overruled sub silentio by *Roe v. Doe,* 246 Ga. 138, 268 S.E.2d 901 (1980), and *Martin v. Heard,* 239 Ga. 816, 238 S.E.2d 899 (1977), and expressly overruled by *Harrell v. Harrell,* supra, 300 S.E.2d 806; heirs of the grantor, *Engel v. Guaranty Trust Co. of New York,* 280 N.Y. 43, 19 N.E.2d 673 (1939); government bodies, *Dade County v. Little,* Fla. App., 115 So.2d 19 (1959); easements, *Katkish v. Pearce,* supra, (this case could also possibly be cited as authority that the rule itself has been rescinded in that jurisdiction); preserve an existing right of way, *Gwinn v. Gwinn,* supra;

*Johnson v. Peck,* 90 Utah 544, 63 P.2d 251 (1936); life estate, *Krug v. Reissig,* supra; reservation is exception and interest retained by grantor, *Allen v. Henson,* 186 Ky. 201, 217 S.W. 120 (1919); joinder in deed, *Derham v. Hovey,* 195 Mich. 243, 161 N.W. 883, 21 A.L.R. 999 (1917); release of dower right, *Board of Missions of Methodist Episcopal Church, South v. Mayo,* 81 F.2d 449 (6th Cir.1936); resulting or constructive trust, *Burns v. Bastien,* 174 Okl. 40, 50 P.2d 377 (1935); protection of grantor, *Lemon v. Lemon,* 273 Mo. 484, 211 S.W. 103 (1918); *Bridger v. Pierson,* 45 N.Y. 601 (1871); words of conveyance, *Holland v. Holland,* supra, (this case may also be considered as a movement toward a general rescission of the rule); estoppel, admission or notice, *Mott v. Nardo,* 73 Cal. App.2d 159, 166 P.2d 37 (1946); *Beinlein v. Johns,* 102 Ky. 570, 44 S.W. 128 (1898); intent determinable to have interest, *Dalton v. Eller,* supra.

exceptions is illustrative only. Exceptions to the invalidity rule are as varied as the factual situation from which they arise. See *Bryan v. Bradley*, 16 Conn. 474 (1844).

■ In summary, this court recognizes the potential of a granting intent to create interests in several people and even different interests among the several people. If that purpose is discernible as an intent of the grantor, then it does not matter what sort of language is used for that purpose. In this case, conveyance intent is recognized or confirmed and the appropriate mineral interest was properly distributed and vested by the trial court.

## II

### Partnership Real Property

The record and briefs do not afford a clear decision whether the mineral interest in the Flying MY Ranch ever became a partnership asset by intention of the parties, as distinguished from a retained status as tenants in common. The resolution that we make affords no difference. *Hannold v. Hannold*, 4 N.J.Super. 381, 67 A.2d 352 (1949).

" * * * [I]t will not be necessary to make a specific finding as to whether or not the real estate involved herein was partnership property. In any case, land is regarded as personalty only so long as a necessity therefor exists." 67 A.2d at 353.

After the death of Kistler in 1964, the conduct of the parties, including income tax returns, *Roberts v. Roberts*, 113 Colo. 128, 155 P.2d 155 (1945), demonstrates that a reconstituted partnership was created to continue until liquidation, commencing with the ranch sale in 1970. The oral partnership of Simpson and Kistler was replaced by an entity to continue as an oral partnership of Simpson and the Kistler heirs until the ranch itself was then sold. *Gibboney v. Derrick*, 338 Pa. 317, 12 A.2d 111 (1940).

■ Liquidation of a partnership moves in three stages: dissolution—winding up—termination. *Webber v. Rosenberg*, 318 Mass. 768, 64 N.E.2d 98 (1945); *Timber-mann v. Timbermann*, 272 Or. 613, 538 P.2d 1254 (1975); 60 Am.Jur.2d, Partnership § 171, p. 91; Crane and Bromberg, Law of Partnership, Ch. 8, Dissolution and Winding up of Solvent Partnership, § 73, p. 416 (1968).

The first partnership of Kistler and Simpson was never wound up or terminated technically. It was converted or reconstituted into a partnership of Simpson and the Kistler heirs and devisees for the next six to eleven years. The windup and termination stage continued from ranch sale to final distribution.

The liquidation of the resulting second partnership of Simpson and the Kistler heirs was completed through the three stages by sale of the ranch in 1970, and the final distribution of proceeds as then completed by 1975.

In the present mineral-estate controversy, Simpson postures their approach in saying that the surviving partner and now his heirs became the owners of any partnership mineral interest pursuant to § 17–13–614, W.S. 1977 (Uniform Partnership Act (U.L.A.) § 42). They contend that if the Flying MY minerals were partnership assets, W.L. Kistler, Jr., during his life, had no claim to specific partnership property, and at his death partnership rights vested in the surviving partner with heirs of the deceased partner being only entitled presently to cash value at date of death.

Conversely stated, the contention advanced is that the Kistler heirs are not entitled to division and partition of partnership real property which was not sold prior to termination or needed to satisfy debts of the partnership.

We do not accept the contention as Wyoming law.

Whether the mineral interests were held by the participants Simpson and Kistler in a partnership as an aspect of the ranching operation or were owned separately as cotenants, the status continued in identical fashion after the death of Kistler, when the Kistler heirs became substituted partners in the continued operation. The original

partnership was never wound up in a technical sense. The evidence is conclusive that, after the death of Kistler in 1964, another partnership continued the operation with the heirs or assigns as successor partners until the ranch sale and partnership termination. Appropriate tax returns were filed for the operational years, and profits divided or contributions made in accord with the investment percentage. *Roberts v. Roberts,* supra.

 Appellants, by their argument, failed to recognize an additional principle. Upon the death of a partner, the successor partner is the trustee of assets for the benefit of heirs of the decedent. *United States v. Hankins,* 581 F.2d 431 (5th Cir. 1978), cert. denied 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). See § 17-13-502(b)(iv) (last sentence). Moreover, the rule of title interest of the succeeding partners being record owner, lasts only through termination by distribution. The established rule thereafter is that as to the partnership realty which was not required to settle debts or then not sold or transferred is owned by the partners or their heirs as tenants in common. *Webber v. Rosenberg,* supra.

" * * * [W]e treat the agreement as a termination of the partnership, and in effect as a distribution of its remaining assets, real and personal, to the partners. * * * [T]hereafter the parties were tenants in common of the real estate. Tiffany on Real Property (3rd ed.) s. 448; *Moffett v. Moffett,* 131 Kan. 582, 292 P. 947, 77 A.L.R. 300; 40 Am.Jur., Partition, s. 123." 64 N.E.2d at 100.

 Directly stated, it matters not if the interest in the Flying MY Ranch mineral interest was acquired by Kistler through the original land purchase as a partner or as a co-tenant. Today, whatever right was originally acquired is now held as co-tenant with the termination of the ranch partnership. It otherwise did not matter by 1985 whether the partnership was reconstituted in 1964 after the death of Kistler as a second partnership which was liquidated in 1970 to 1975 through the ranch sale or whether only the first partnership existed which was in a winding-up status for the numerous years after the death of the one partner, from 1964 to 1985. *In re McCormick's Estate,* 286 Ill.App. 90, 2 N.E.2d 967 (1936). *Blumer Brewing Corporation v. Mayer,* 223 Wis. 540, 269 N.W. 693, 111 A.L.R. 1087 (1936), and *Gianakos v. Magiros,* 238 Md. 178, 208 A.2d 718 (1965), are distinguishable as different on the facts as not involving real estate remaining after termination.

Today, the successors in interest hold original mineral rights as co-tenants.

### III

*Sufficiency of the Evidence For Creation of a Constructive Trust*

Since this subject is not designated as a question for consideration by appellant (although designated and discussed by appellee), the comments will be brief. We adhere to the accepted rule on evidentiary review upon appeal. *Lynch v. Patterson,* Wyo., 701 P.2d 1126 (1985). Persuasive evidence is included in the record.

Taking the issues as presented, we would also find that any discussion of the estate tax return would only relate to the burden of proof, and we will not further evaluate the relationship of an estate tax return to issues of claims to or devolution of title by constructive trust. *Dayvault v. Baruch Oil Corp.,* 211 F.2d 335 (10th Cir.1954) (oil-interest case).

We hold that the trial court did not err as a matter of law, substantial evidence supported the decision, and the decision and judgment should be affirmed.

Affirmed.