Robert O. McKONE, Appellant (Defendant),

v.

Melvin GUERTZGEN and Claudia Guertzgen, husband and wife, Appellees (Plaintiffs).

No. 90–247.

Supreme Court of Wyoming.

May 23, 1991.

William R. Shelledy, Jr. of Scott, Shelledy and Luhm, Worland, for appellant.

Steven R. Helling and Bruce N. Willoughby of Murane & Bostwick, Casper, for appellees.

Before URBIGKIT, C.J., and THOMAS, CARDINE, MACY and GOLDEN, JJ.

CARDINE, Justice.

McKone, the vendor of real property under an executory contract for deed, appeals the district court's order that he is the one responsible for the removal of the abandoned underground storage tanks located on the property.

We affirm.

McKone raises the following issues:

"1. Whether the District Court erred when it looked beyond the Contract for Deed to determine the responsibilities of the parties as to Fire Marshal's request to remove underground fuel storage tanks?

"2. Whether the District Court erred when it looked beyond the Contract for Deed and the Fire Code to determine the responsibilities of the parties as to the Fire Marshal's request to remove underground fuel storage tanks?

"3. Whether the District Court erred when it relied upon *Olds v. Little Horse [Creek] Cattle Co.*, as authority when it determined the responsibilities of the parties as to the Fire Marshal's request to remove underground fuel storage tanks?

"4. Whether *Olds v. Little Horse [Creek] Cattle Co.*, 140 P. 1004, 22 Wyo. 336 (1914) should be overruled if it is determinative of the responsibilities of parties as to contracts for deed between individuals?"

In 1981, McKone agreed to sell real property located in the Town of Thermopolis to the Guertzgens. The parties drafted their agreement in the form of a contract for deed (also known as an installment land contract). It provided, *inter alia*, that the Guertzgens would have possession of the property, but that the warranty deed would remain in escrow until all the payments had been made under the contract. The final payment was scheduled for June 15, 1991.

The Guertzgens converted the property, formerly a service station, into a liquor store/lounge. In 1989, after the Guertzgens had made substantial payments under the agreement, the Chief of the Thermopolis Fire Department ordered the removal of the property's underground fuel tanks because they violated the Uniform Fire Code. The tanks were not in use when the Guertzgens took possession of the property in 1981. The Guertzgens argued that McKone should pay for the removal of the tanks because, legally, he is still the owner of the property (the warranty deed remains in escrow until the full amount of the purchase price has been paid).

The parties submitted memoranda and exhibits, along with a set of stipulated facts, to the district court which ruled that McKone was the legal owner of the property and responsible for the removal of the tanks. We stated in *True v. Hi-Plains Elevator Machinery, Inc.*, 577 P.2d 991, 996 (Wyo.1978), that a district court's "general finding and judgment for the successful party carries with it every finding of fact which can reasonably and fairly be drawn from the evidence."

McKone contends that the provisions in the parties' agreement for repair and risk of loss impose the responsibility for the removal of the tanks upon the Guertzgens. Neither of these provisions,

however, address this particular contingency. Thus, we look elsewhere to determine the responsibility for the removal of the tanks.

■ McKone also believes the Uniform Fire Code (1988 ed.) (Code) holds the Guertzgens responsible for the removal of the tanks. McKone argues that the Guertzgens "best fit the Code's definition" of the person responsible for the abandoned tanks. He bases his argument on the Code requirement, found in § 3.102, that the "owner, operator, occupant or other person responsible for the condition or violation" must comply with the orders and notices issued by the fire marshall. McKone cites the Code's definition of owner, which "includes his duly authorized agent or attorney, a purchaser, devisee, fiduciary and a person having vested or contingent interest in the property in question" to conclude that the Guertzgens are the ones responsible for the removal of the tanks.

In *Matter of Estate of Ventling*, 771 P.2d 388, 389 (Wyo.1989), we acknowledged that the purchaser under a contract for deed has an "equitable interest" in the property. Thus, we agree that the Guertzgens fit the Code's definition of owner because their equitable interest in the property is also a contingent interest, which the Code includes under the definition of owner. McKone, however, also fits the definition of owner. The parties' agreement provides that the warranty deed remains in escrow until the Guertzgens have made all the payments under the agreement and the warranty deed is conveyed to them.

Professor Rudolph has summarized the legal principles of the contract for deed: "The contract [for deed] typically provides for the payment of the purchase price in installments over a period of years and for retention of title in the seller until the purchase price is fully paid, but gives the buyer a right to possession from the execution of the contract." Rudolph, E. George, *The Wyoming Law of Real Mortgages*, pp. 147–48 (1969).

*See Matter of Estate of Ventling*, 771 P.2d at 389, wherein we stated: "At all times prior to the final payment and the delivery of the deed, even though the buyer usually has possession, legal title remains vested in the seller." Until there has been a conveyance of the warranty deed, McKone continues to hold legal title and remains the legal owner of the property.

■ Because both the Guertzgens and McKone fall within the Code's definition of owner, we focus on the language "or other person responsible for the condition or violation" found in § 3.102 to determine who is responsible for the removal of the tanks. This language requires that—in addition to being the owner, operator, or occupant of the property—one must also be the person responsible for the condition or violation. Thus, who owned the property when the tanks were abandoned is an important factor in fixing the liability for their removal.

In a confusingly worded stipulation, the Guertzgens and McKone agreed "[t]hat prior to May 9, 1981 [the date of the agreement for warranty deed], the underground storage tanks had been decommissioned by a prior Contract for Deed person, not the the [sic] Plaintiffs or the Defendant, and have not been in use since that time." We interpret this stipulation to mean that McKone was the vendor of the same property when the tanks were abandoned under a previous contract for deed. It may be that the person most responsible for the abandonment of the tanks (the previous purchaser under contract for deed) is not a party to this action. Nonetheless, given the facts and the parties now before us, we hold that McKone is the party responsible for the removal of the tanks because he was the owner of the property when they were abandoned.

The Code supports the district court's general finding and judgment in favor of the Guertzgens; and accordingly, we do not address the other issues raised by McKone.

URBIGKIT, C.J., and GOLDEN, J., dissent with opinion.

URBIGKIT, Chief Justice, dissenting.

When Robert O. McKone entered into a transaction with Melvin Guertzgen and Claudia Guertzgen to sell a business lot in Thermopolis, Wyoming on May 9, 1981, none of them expected that abandoned underground petroleum product storage tanks would come back to haunt both the seller and the buyers. Events change rapidly in this society in which we live and society came back to them to look with disdain, suspicion and active antagonism upon the abandoned underground petroleum product storage tanks.

The buyers bought the property "as is, where is." [1] Unfortunately, in acceptance of an invalid legend of the advantages of the escrow deed arrangement for an installment contract of sale (probably to avoid classical foreclosure upon default), the parties were faced with events occurring since sale which have severely impacted the property's value—abandoned underground petroleum product storage tanks. [2]

The buyers paid promptly and properly on the installment contract for about eight years until notice by the fire marshall of current law changes and regulations regarding abandoned underground petroleum product storage tanks. State and federal laws were enacted and state and federal administrative agencies were empowered. Hundreds of thousands of old filling station site abandoned underground petroleum product storage tanks became a heavy problem which not only surfaced, but explosively mushroomed. See the most re-cent text of the Water Pollution from Underground Storage Tanks Corrective Action Act of 1990, Wyo.Sess. Laws ch. 98 (1990), W.S. 35–11–1414 through 35–11–1428 (Cum.Supp.1990). See also the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, 42 U.S.C., § 9611 (1988) and the Resource Conservation and Recovery Act of 1976, 42 U.S.C., § 6901 (1988). See, generally, the Wyoming Environmental Quality Act, W.S. 35–11–101 through 35–11–403, 35–11–405, 35–11–406, 35–11–408 through 35–11–1104 and 35–11–1414 through 35–11–1428 (Cum. Supp.1990).

We are now faced in this appeal with society's imposition of an expensive cost upon the landowner and are asked who is to pay—the seller or the buyers? I would really like to believe that some part of the responsibility should be placed upon whoever advised these parties to use the installment sale technique instead of a note and mortgage, but those other parties are not here before us. We have a seller, buyers and an imposed cost by the government.

This majority now assesses responsibility on the seller within an incomplete record which does not accurately advise when the filling station usage was discontinued or necessarily who owned the property at that time.

　1. That prior to May 9, 1981, the underground storage tanks had been decommissioned by a prior Contract for Deed person, not the * * * Plaintiffs or

---

**1.** Meaning in real estate trade terms a characterization of the agreement that the identified property and improvements were sold without warranty of fitness or quality except as done here and provided normally to warrant title. The only actual warranty provided here by seller in sales documents was for title which was covered by a mandatory examination and objection abstract review process. "Buyer shall advise Seller of any defects in title within [two weeks]* * *." The provision of the agreement placed total responsibility upon buyer for maintenance of the real property and improvements, remodeling and reconstruction, with payments to include all taxes levied and assessed against the real property after the year of sale. The term "as is" means the property is sold without warranty and "where is" defines the identity and possible problems. This property was a known closed filling station. *Wolford v. Freeman,* 150 Neb. 537, 35 N.W.2d 98 (1948); *Montague v. Bank for Savings in City of New York,* 181 Misc. 863, 43 N.Y.S.2d 321 (1943). See also an affirmative use of an "as is" clause in the Uniform Commercial Code, W.S. 34.1–2–316(c)(i).

**2.** Knowledgeable attorneys experienced in real estate and a few experienced realtors should know that a deed and mortgage is a preferable land sale security device, with exception in some very limited circumstances, but almost never as an exception if the payment is long term. *See* Nelson and Whitman, *The Installment Land Contract—A National Viewpoint,* 1977 B.Y.U.L.Rev. 541 (1977).

the Defendant, and have not been in use since that time.

I dissent in disinclination to continue the fiction of ownership derived from the antiquated differentiation between a note and mortgage security interest and the installment sale contract as another real estate purchase price security device. I would just abandon the artificiality of the fiction, no matter how long matured in legal dialogue.[3]

Except for the frequently misunderstood criteria for foreclosure upon payment default, only remanents of archaic and outdated concepts of law survive to distinguish the ownership of land held subject to note and mortgage or by escrow deed and installment contract. *Olds v. Little Horse Creek Cattle Co.,* 22 Wyo. 336, 140 P. 1004 (1914) served a different purpose in historical Wyoming law and I would not now expand that case to create a continued fiction to provide a difference in actual rights of ownership where, in practical fact, none actually continue.

It is appreciated that this majority supports its conclusion by accurate and long-standing legal concepts. My difference is that we should now abandon those fictions derived from times long past and economic relationships long gone. For current review with legislative change, see Kershen, *Contracts for Deed in Oklahoma: Obsolete, But Not Forgotten,* 15 Okla. City U.L.Rev. 715 (1990).

For this case, I would hold that the buyers, by their agreement, bought problems of future governmental action with land purchased in specific accord with the "as is, where is" provisions of the written agreement. I would reverse the district court's judgment in impression upon the seller of the obligation to succor the buyers from governmental required tank removal. Further, I would determine that the unknown and unforeseen go with the risk of purchase and do not remain with the equity of retained sale price obligation. The owner of the premises should be the possessor

with rights to the property, not the holder of a security device for purchase payment.

Additionally, I have a problem fitting in the abandoned tank removal issue with the injunction requested in complaint and the tank removal declaratory judgment granted in disposition. I do not know where the parties will go from here since the litigation started with a request for an injunction to forestall foreclosure upon non-payment of installment payments. Perhaps by now someone has removed the tanks, no leakage has previously occurred and a dollar amount can be determined. If not, I lack assurance what will happen next or even if the state contribution for tank removal pursuant to W.S. 35–11–1424 (Cum. Supp. 1990) is a possibility. It certainly is a possibility that the tanks have leaked and that the clean up costs could substantially exceed the value of the real estate and certainly exceed the amount remaining payable on the purchase price security instrument.

Unless society would contribute, I would leave the problem with the present property owners, and consequently dissent to this majority's decision to the contrary.

GOLDEN, Justice, dissenting

I respectfully dissent. When resolving this sort of dispute this court looks first to the parties' agreement. If the writing is unambiguous it expresses and controls the parties' assignment of rights and obligations. *Narans v. Paulsen,* 803 P.2d 358, 362 (Wyo.1990). I believe we need go no farther than the language of the written agreement to decide this case.

The majority applies this principle, but finds the provisions asserted by McKone do not address this particular contingency, and looks beyond the agreement language to determine liability for the cost of removing the abandoned tanks. In his dissent Chief Justice Urbigkit also looks to the agreement and resolves the issue to his satisfaction by applying "as is, where is" provisions of the written agreement.

---

**3.** See the discussion of archaic and inappropriate feudalistic principles of real estate law discussed in *Simpson v. Kistler Inv. Co.,* 713 P.2d 751 (Wyo.1986).

I agree with the majority that the provisions McKone relies on do not allocate the burden of removal costs, but do note they evidence the intent of the parties that the Guertzgens would shoulder all responsibilities connected with the property when they assumed possession. I cannot identify an "as is, where is" provision, but I find that another agreement term does assign responsibility for removing the tanks in a manner consistent with the delegations in the provisions offered by McKone. As we consider the writing as a whole when establishing the intent of the parties, the consistency of all these provisions is significant. *True Oil Co. v. Sinclair Oil Corp.*, 771 P.2d 781, 790 (Wyo.1989).

We are not concerned here so much with allocation of risk of loss as we are with determination of which party is responsible for compliance with laws. The agreement assigns this responsibility to the Guertzgens where it states that buyer agrees to purchase and take the property

> SUBJECT TO easements, reservations and restrictions of record and to Zoning *and other laws.* (emphasis added).

The Guertzgens took possession subject to laws, and by doing so assumed the obligation of compliance with them.[1] This reading is consistent with the other provisions of the parties' agreement. Logically, the Guertzgens' possession is subject to laws existing when the agreement was entered and any since enacted. Consequently, the Guertzgens, and not McKone, must bear the financial burden of compliance with laws affecting this property.

I would reverse the decision of the trial court.

---

1. There is no evidence of any warranty by seller that the property was in compliance with applicable laws and regulations at the time the agreement was signed.